## AFFIDAVIT OF SPECIAL AGENT MARGARITA C. BRITO

I, Margarita C. Brito, being sworn, state:

1.      I have been a Federal Bureau of Investigation ("FBI") special agent since October 2003. I am currently assigned to the Boston Office of the FBI, and my duties include investigating computer intrusions. My experience includes investigating cases involving the use of computers, e-mail accounts and the Internet. During my four years with the FBI, I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures.

2.      I am currently investigating Barbara Denenburg for illegally accessing the computer and telephone systems at Tele-Publishing International ("TPI"), a personal advertisement company in Massachusetts, for using this access to obtain confidential information belonging to TPI and its customers, and for harassing and threatening a Massachusetts woman.

3.      I submit this affidavit in support of an application for a complaint, charging Denenburg with mailing threatening communications (in violation of 18 U.S.C. §876(c)), access device fraud (in violation of 18 U.S.C. §1029(a)(2)), and violating two sections of the computer fraud and abuse act (18 U.S.C. §§1030(a)(2)(C) and 1030(a)(5)(A)(I)).

4.      I base this affidavit on: (a) my personal knowledge and involvement in the investigation; (b) information provided by other FBI agents and Postal Inspectors who have participated in this investigation; (c) information provided by TPI; (d) a review of various documents and records; and (e) my experience and training as a criminal investigator.

5.      This affidavit includes only those facts that I believe are necessary to establish probable cause and does not include all of the facts uncovered during the investigation.



## BACKGROUND

6. TPI is a subsidiary of the Phoenix Media Communications Group and is located in Boston, Massachusetts. TPI provides voice personal ad services for hundreds of newspapers throughout the country. The personal ads appear in the newspapers, but to respond to the ad, a reader calls a phone number at TPI that is assigned to the newspaper in which the ad is published and leaves a voicemail message for the person who placed the ad. People placing an ad, who TPI refers to as "members," are assigned a six digit box number, which is then referenced by people responding to the ad. TPI assures its members that their voicemail boxes are private, anonymous and secure. Members can access their boxes with their six digit box number and a four digit password.

7. Each newspaper is assigned at least three distinct telephone numbers. The first number is a toll-free number for members. The second is a 1-900 pay-per-minute telephone number for people wishing to respond to an ad. The third is a toll-free number for people who have prepaid for the minutes they use leaving or checking messages on TPI's system. These prepaid minutes are known as "pin time" and can be accessed with a five digit access code, or pin.

8. All calls to TPI are handled by the same computer-controlled telephone system, located in Massachusetts. TPI maintains several Interactive Voice Response Systems computers to handle the voice personal ad calls. These Voice Response Systems are connected to a computer that stores the voice messages and to another computer that stores specific information about the calls and messages.

## THE CRIMINAL CONDUCT

### Accessing TPI's Computers

9. In June 2007, TPI began receiving complaints from members whose passwords or

2

profiles had been changed without their knowledge. TPI also received complaints from members with "Female Seeking Female" profiles, who were receiving long messages from someone claiming to be a federal law enforcement officer, warning the member about a woman named Laurie or Laura from Connecticut.

10.     TPI personnel listened to other messages sent using the same sender identification as these "federal officer" warnings and found that the person leaving the warnings was also leaving regular messages for other members, often identifying herself as "Bonnie." TPI call center personnel became very familiar with "Bonnie's" distinctive voice and able to identify messages left by her even when she was using one of her aliases. By correlating messages left by "Bonnie" with sender identification number records and phone records, TPI was able to identify several telephone numbers and aliases that "Bonnie" frequently used.

11.     TPI has established that, from June through August, 2007, "Bonnie" hacked into more than 200 female members' accounts, changed the greetings for at least 25 of them, and changed the passwords for more than 40 members. "Bonnie" also left many messages claiming to be a "federal detective" and others claiming to be a TPI agent.

Harassing Messages Using Stolen Pin Time

12.     TPI also found that "Bonnie" left hundreds of her messages using stolen pin time – meaning pin time that had never been paid for or that belonged to other customers.

13.     For example, "Bonnie" left four messages on July 18, 2007 using pin number 14258, which TPI records indicate was never paid for. All four messages were left during a call lasting approximately 23.5 minutes, from telephone number (215) 742-4079, to the non-members telephone number for the Philadelphia Gay News.

3

14.     The first message, for a member named Darlene, states, "it is an actual obligation legally from the highest ranking judge of the state of Connecticut . . . no one shall communicate with, shall call, shall talk to, shall meet, shall date, shall have anything to do with this Laurie, Lauren or Laura from [town], Connecticut." The caller instructs that "should you get a call, a message on your box, from this woman, listen to the message but put the message on save so we can tape it." The caller also warns that it is a "felony offense to erase any message from a detective before writing the information down that you need in order to cooperate with the judge's ruling which is law in every state."

15.     A second message, for another member, states, "[Laura] is mentally sick, she has seven major mental illnesses, she's capable of murder, she's been suspected of sexually abusing her own children, she has ignored hundreds of court orders to report to daily psychiatric intervention." A second message to the same member instructs the member not to delete any message from Laura because law enforcement officers will be able to listen to the message, and the member will be awarded $10,000 if she is the first woman to have a message from Laura.

16.     In August 2007, "Bonnie" began concentrating on a member named Angie. "Bonnie" left approximately 30 messages for Angie using various different names. In some of the messages, "Bonnie" threatened to "report" Angie for not replying to her messages. TPI records indicate that in addition to leaving Angie messages, "Bonnie" logged into Angie's account numerous times.

17.     At the end of August, TPI modified the settings on the computers handling most of the "Bonnie" telephone calls so that the computers would track member logins. On August 24, 2007, TPI computer logs show someone attempting to access Angie's account by phone and failing twice before the call was disconnected. The logs show that less than a minute later, someone obtained

4

Angie's password using the password lookup feature in the system. The password lookup system allows a caller who has forgotten her password to obtain it by entering her date of birth. The caller was able to successfully obtain Angie's password by entering the correct date of birth. The logs indicate that after the caller obtained Angie's password, the call ended.

18.     Shortly thereafter, there are several calls where the caller logged into Angie's account successfully. During one of those calls, the caller attempted to change the password but failed because TPI had changed the procedures for password changes. TPI telephone records indicate that these calls came from a telephone number that "Bonnie" had previously used. After these incidents, TPI employees changed the password and birthdate for Angie's account.

19.     On August 29, 2007, TPI logs show someone attempting to access Angie's account with the old password and failing. An attempt to look up Angie's password was then made using the same date of birth used on August 24. After this attempt failed, the caller entered a series of different dates of birth until she was successfully able to obtain the password. TPI telephone records indicate that these calls were also made from a telephone number that "Bonnie" had previously used.

20.     In repairing the changes "Bonnie" made to TPI members' mailboxes, assessing the extent of her intrusion, and attempting to safeguard its computers from further intrusions by her, TPI incurred costs far greater than $5,000.

## Harassment of TPI Member Wendy

21.     "Bonnie" started speaking to a TPI member named Wendy, from Massachusetts, on June 28, 2007, after "Bonnie" answered Wendy's personal ad. "Bonnie" identified herself as Dr. Barbara Raphael but said she preferred to be called Bonnie. Wendy and "Bonnie" spoke frequently throughout July and August, 2007. During that period, Wendy provided "Bonnie" with a lot of

5

personal information, including the names of family and friends and her home address.

22. In late August, a friend of Wendy's, named Kristian, came to visit Wendy for a few days. Throughout the time the friend was there, "Bonnie" repeatedly called Wendy and left messages, demanding that Kristian leave. In all, "Bonnie" left approximately 100 messages during the time Kristian was visiting. After Kristian left, "Bonnie" stopped harassing Wendy for several weeks.

23. On September 17, 2007, Wendy went to New Hampshire to visit another friend, named Deborah. Wendy told "Bonnie" that she would be out of town and that her friend, Pam, was going to housesit. While Wendy was in New Hampshire, "Bonnie" called Pam's supervisor at work and told her that Wendy was a mass murderer and a fugitive. Pam then called Deborah in New Hampshire and gave Deborah Bonnie's phone number. Deborah called "Bonnie," in an effort to determine why "Bonnie" was spreading lies about Wendy. Now that she had Deborah's phone number, "Bonnie" began continually calling Deborah, telling her, among other things, that Wendy was a murderer, who would be arrested and executed.

24. When Wendy returned home, she called "Bonnie" and asked her to stop calling Deborah. "Bonnie" did stop calling Deborah but began calling Wendy at all hours of the night. Among other things, "Bonnie" threatened that Wendy would be terminated from her job, that Wendy would lose money, and that Wendy would be arrested and executed.

25. On September 18, 2007, TPI personnel noticed that "Bonnie" had left messages for 17 different TPI members, warning them about Wendy. In these messages, "Bonnie" said that Wendy has committed hundreds of crimes, including murder, and she instructed the members to have nothing to do with Wendy.

6

26.     On September 24, 2007, "Bonnie" called the TPI call center claiming to be Wendy. She said that she wanted to make sure that Wendy's voice greeting was removed from the service. The TPI representative taking the call recognized the voice as "Bonnie" and transferred her to the call center supervisor. "Bonnie" was able to verify the old password on the account as well as the phone number on the account; however, she was unable to identify the newspaper with which the account was originally affiliated. While "Bonnie" was still on the phone, the real Wendy called to report that someone had been harassing her.

27.     On September 28, 2007, Wendy changed her phone number. The next day, "Bonnie" started calling Deborah again and has not stopped.

### The Mailed Death Threats

28.     On October 9, 2007, Wendy received an express mail envelope sent from Palmyra, New Jersey, a Philadelphia suburb. The return address on the label was "Gay Task Force, 34 East Broad St, Palmyra, NJ." Inside the express envelope was another envelope with a printed label reading, "We all know what you did." There were also two cards, covered with white printed labels, on which was written, among other things, that Wendy is a criminal and sociopath and will stand trial and be executed. One of the cards stated that Wendy would be executed through lethal injection and cremation on October 12, 2007.

29.     On October 10, 2007, Wendy received an express mail envelope sent from Philadelphia, Pennsylvania on October 2, 2007. The return address was "SOBS c/o Enterprise, Randolph Patriot Ledger, Old Colony Memorial and Community Papers, Plymouth, MA 02360."[1] Inside were greeting cards, covered with white printed labels reading, among other things: "Wendy

---

[1] S.O.B.S. is the acronym for a personal ad company called South of Boston Singles.

7

is much worse than the devil," and "Lying, Slandering, Psychopath and Sociopath, you don't need to be possessed where you're going!!! You're going way below hell."

30.    Also inside this express mail envelope was a card, which had been partially ripped up, and which Wendy recognized as one she sent, in August, to "Bonnie," at 1801 Evarts Street, Apt. C1, Philadelphia, PA, the address that "Bonnie" had given her. The labels on the card stated, among other things, "The name is Bonnie, stupid. Bonnie told you never to call her Barbara because it was never her real name."

31.    On October 13, 2007, Wendy received an express mail package sent from Cinnaminson, New Jersey, another Philadelphia suburb. The return address was "Multiple Sclerosis Foundation." The box was filled with dirt. Planted on the dirt was a rectangular piece of cardboard, apparently meant to look like a tombstone, on which was written "RIP, Wendy, [date of birth] to Oct 20, 2007, Hated by all women of S.O.B.S. and all women everywhere."

### Barbara Denenburg is "Bonnie"

32.    Wendy called "Bonnie," or received calls from her, from eight different telephone numbers, including (215) 742-4079 and (215) 305-5812.

33.    From call logs, TPI identified several telephone numbers that "Bonnie" regularly used to leave messages, including telephone numbers (215) 742-4079 and (215) 305-5812, two of the numbers from which Wendy received calls.

34.    These numbers are both land telephone lines belonging to Cavalier Telephone Company. Cavalier records show that both telephone numbers are linked to the same customer number. The telephone number (215) 742-4079 was disconnected in September 2007 and replaced with (215) 305-5812. Cavalier records show the billing information for these numbers as "Barbara

8

D. Denenburg, 8514 Summerdale Ave, Philadelphia, PA 19152." The service address – the address where the phone is physically located – is "Barbara D. Denenburg, 1801 Evarts St. Apt. C1, Philadelphia, PA 19152." TPI telephone records show more than 100 telephone calls from this land line to TPI between September 30, 2007 and October 4, 2007.

35.     TPI has also determined that, in addition to using stolen pin time, "Bonnie" has been using the company's personal ad service legitimately for more than a year, and has been paying for her call time using a bank card. The bank card "Bonnie" used was a debit card linked to a Wachovia bank account in the name of Barbara D. Denenburg, 8514 Summerdale Ave, Philadelphia. The records for this bank account show hundreds of TPI related charges as well as numerous Vesta/T-Mobile charges. Vesta Corporation allows T-Mobile prepaid customers to refill their telephone minutes using a credit card.

36.     Vesta Corporation records indicate that the Wachovia debit card "Bonnie" used is linked to a Vesta account opened on March 12, 2006, by Barbara Denenburg, 8514 Summerdale Ave, Philadelphia, Pennsylvania. In addition, Vesta records indicate that the Wachovia debit card was used to purchase additional minutes on eleven different T-Mobile ToGo prepaid wireless telephone numbers, all of which "Bonnie" used to call Wendy and TPI.

37.     A clerk who worked at the Philadelphia, PA 19111 post office on October 2, 2007 – the day that the package containing greeting cards covered with threatening writing was sent to Wendy from that post office – identified a photograph of Barbara Denenburg as being the woman who mailed that package. The photograph was taken from a Pennsylvania Identification Card in the name of Barbara Diane Denenburg, 8514 Summerdale Avenue, Philadelphia, PA 19152. The clerk remembered Denenburg because she is a regular customer.

9

38. On that date – October 2, 2007 – Denenburg also mailed an express mail envelope to the Emerson Apartments Property Management.[2] On the return address portion of the label, she wrote "Barbara Denenburg, 1801 Evarts St., Apt. C1, Philadelphia, PA." Denenburg then spent about 30 minutes filling out a second express mail label for the package she sent to Wendy in Brockton. The return address that she wrote on the label was "SOBS" at a Massachusetts address. The clerk remembers commenting to Denenburg that this was not her regular address. Denenburg replied that she did not want the recipient to know who sent the package.

39. The two addresses that Denenburg has used are not far from each other. 1801 Evarts St., Apt. C1, Philadelphia, is part of an apartment complex known as Emerson Apartments and is less than a quarter of a mile from 8514 Summerdale Ave., Philadelphia. 2007 tax records indicate 8514 Summerdale Ave. is owned by Lillian Denenburg, who is 83 years old.

40. I believe Barbara Denenburg is the tenant at 1801 Evarts St., Apt. C1 because the Cavalier land telephone line used to repeatedly call TPI is located at this address. Additionally, "Bonnie" provided the 1801 Evarts St., Apt. C1 address to Wendy as her mailing address. Finally, Barbara Denenburg sent an express mail envelope to the Emerson Apartments Management, using 1801 Evarts St., Apt. C1 as her return address.

41. I further believe that Barbara Denenburg receives her mail at 8514 Summerdale Ave. and spends a significant amount of time there. I believe this because 8514 Summerdale Ave. is listed as the billing address on her telephone, the address on her bank account, and the address on her Pennsylvania Identification Card.

---

[2] This is the company that manages the 1801 Evarts Street apartment building.

10

## CONCLUSION

42. Based on my training and experience, and the investigation I and other FBI agents have done in this matter, as outlined above, I have probable cause to believe that Barbara Denenburg has mailed threatening communications (in violation of 18 U.S.C. §876(c)),[3] committed access device fraud (in violation of 18 U.S.C. §1029(a)(2)),[4] and violated two sections of the computer fraud and abuse act (18 U.S.C. §§1030(a)(2)(C) and 1030(a)(5)(A)(I)),[5] all in the District of Massachusetts.

---

[3] 18 U.S.C. §876(c)) applies to "Whoever knowingly deposits in any post office or authorized depository for mail matter, to be sent or delivered by the Postal Service . . . any communication . . . addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another . . . ."

[4] 18 U.S.C. §1029(a)(2) applies to whomever "knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period." An "access device" is defined as "any . . . telecommunications service . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value." 18 U.S.C. §1029(e)(1).

[5] 18 U.S.C. §1030(a)(2)(C) makes it a crime to "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[]– . . . information from any protected computer if the conduct involved an interstate or foreign communication." The statute defines a "protected computer" as a computer "used in interstate or foreign commerce or communication." 18 U.S.C. §1030(e)(2)(B).

18 U.S.C. §1030(a)(5)(A)(i)) makes it a crime to "knowingly cause[] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, to a protected computer; . . . and [by such conduct, cause] "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."

11

Subscribed and sworn to under the pains and penalties of perjury.

*Margarita C. Brito* [signature]

Margarita C. Brito, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me October 17, 2007.

*Marianne B. Bowler USMJ* [signature]

Hon. Marianne B. Bowler
U.S. Magistrate Judge

12